**In re Charles Bemrose DREWRY and Julia Martha Drewry, Debtors.**

**Charles Bemrose DREWRY and Julia Martha Drewry, Plaintiffs,**

**v.**

**METROPOLITAN LIFE INSURANCE, Production Credit Association of La Porte, First Bank of Whiting, Maurice and Inell Busselberg, Bank of Indiana, USAMEX, Conagra, Inc., and Grower Service, Inc., Defendants.**

**Bankruptcy No. 85–60250.
Adv. No. 86–6014.**

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

April 5, 1989.

David A. Rosenthal, Lafayette, Ind., for plaintiffs.

William Elliot, La Porte, Ind., for Production Credit Ass'n.

Robert Stochel, Crown Point, Ind., for First Bank of Whiting.

Martin Kinney, Merrillville, Ind., for Maurice and Inell Busselberg.

Lambert Genetos, Merrillville, Ind., for Bank of Indiana.

George Rubin, and Elliott D. Levin, Indianapolis, Ind., for Usamex Fertilizers, Inc.

L.A. Kalina, Merrillville, Ind., for Conagra, Inc., and Grower Service Corp.

## ORDER

ROBERT K. RODIBAUGH, Senior Bankruptcy Judge.

On February 19, 1986, Charles Bemrose Drewry and Julia Martha Drewry, the debtors herein, filed their Complaint against Metropolitan Life Insurance [1] ("Metropolitan"), Production Credit Association of La-Porte ("Production Credit"), First Bank of Whiting ("Whiting Bank"), Maurice and Inell Busselberg [2] ("Busselbergs"), Bank of Indiana [3] ("Indiana Bank"), USAMEX [4] ("Usamex"), Conagra, Inc. ("Conagra"), and Grower Service, Inc.[5] ("Grower Service"). On March 24, 1986, Whiting Bank filed its Counter–Cross Claim against the debtors, Busselbergs and Indiana Bank. Thereafter on June 4, 1986, Busselbergs filed their Cross Claim against the debtors, Whiting Bank, Usamex, Conagra and Grower Service. In response the debtors filed their Cross Claim against Busselbergs on June 11, 1986. This court held a trial on

these matters on November 23 and 24, 1987, and took the matters under advisement on November 25, 1987.

### Background

On November 6, 1969, Charles Drewry, as grantor, entered into a revocable trust agreement entitled Charles B. Drewry Trust No. 5747 ("Trust No. 5747") providing for the transfer of certain real estate owned by the Drewrys to Indiana Bank as trustee.[6] Trust No. 5747 provided that during the lifetime of Charles Drewry, the trustee was to pay all of the net income of the trust estate to the grantor or as he might otherwise direct in writing. After the grantor's death the trustee was to divide the trust property into separate trusts for the benefit of his wife and after her death for the benefit of those chosen by Mrs. Drewry and the Drewrys' son. In conjunction with Trust No. 5747 the debtors executed a Deed in Trust in favor of Indiana Bank. Later, on or about January 3, 1971, Indiana Bank became a secured creditor in the real estate by virtue of a $125,000.00 mortgage on the property executed by Indiana Bank as trustee of Trust No. 5747. On January 20, 1972, Indiana Bank recorded the mortgage in the Recorder's Office of Lake County, Indiana.

On January 3, 1974, Charles Drewry and Julia Drewry purchased 966 acres of real estate located in Lake County, Indiana as tenants in common with Maurice Busselberg and Inell Busselberg. The Purchaser's Closing Statement states that the purchase price for the 966 acres was $850,000.00,[7] and that the parties made a down payment of $50,000.00 on the property. As

1. Metropolitan is no longer a party to this action. On November 13, 1987, the court entered its Order dismissing all claims and actions involving Metropolitan.

2. Inell Busselberg is deceased. Paul Busselberg, her son, succeeded to her interest in the land at issue and thus to her position as defendant.

3. Bank of Indiana is now known as Bank One, Merrillville, N.A.

4. The proper name of USAMEX is Usamex Fertilizers, Inc.

5. The proper name of Grower Service, Inc., is Grower Service Corporation.

6. The land description accompanying Trust No. 5747 indicates that the Drewrys did not own the 966 acres in controversy at the time they created Trust No. 5747. None of the parcels listed as property of Trust No. 5747 on November 6, 1969, are part of the 966 acres in controversy.

7. The Drewrys assert that the parties actually purchased the 966 acres for $835,000.00.

tenants in common, the Drewrys and the Busselbergs each held an undivided one-half interest in the real estate. With respect to his or her spouse, each owner held his or her interest in the real estate as a joint tenant with rights of survivorship in his or her spouse. Prior to the purchase of the property by the Drewrys and Busselbergs, the Busselbergs had rented and farmed the real estate for almost thirty years. At the time of the purchase by the parties the following improvements were located on the land: two houses, two garages, a tool shed, a barn, a cattle shed, a feed room, three steel bins, two harvester silos, and an automatic feeding system.

On the day of the purchase the Drewrys and Busselbergs each paid $100,000.00 on the real estate and together borrowed approximately $635,000.00 from the Federal Land Bank of Louisville ("Land Bank") for the remainder of the purchase price. The parties pledged the 966 acres as security for the debt to the Land Bank. This mortgage was recorded on January 3, 1974. Payments on the Land Bank mortgage were approximately $61,000.00 per year. The Busselbergs continued to farm the land under a fifty-fifty agreement with the Drewrys regarding their undivided one-half interest in the real estate. Pursuant to the agreement the Drewrys paid one-fourth of all farming expenses and received one-fourth of all profits from the farming of the real estate. At some point the parties apparently discontinued this arrangement, and Busselberg Farms, Inc., the Busselbergs' corporation, began to lease the Drewrys' undivided one-half interest in the 966 acres for $105.00 per tillable acre pursuant to the terms of a Farm Lease.

In the late 1970's the Drewrys built three bins on the farm to be used for drying and storing grain which the Drewrys paid for themselves. The parties understood that the Drewrys would use the bins to dry and store corn grown on the real estate (and possibly other grain) and that the Drewrys would keep the profits from their activities. The three bins, however, were to become part of the real estate (fixtures). On November 24, 1981, the Drewrys and Busselbergs entered into an eight-month Sales Agency Contract to sell the 966 acres for $4,347,000.00 with an option to lease the real estate. The realtor, though, did not sell the property.

On December 1, 1982, the principal balance of the Land Bank mortgage on the 966 acres of real estate was $461,035.93. On December 28, 1982, the Drewrys, Busselbergs and Indiana Bank as trustee of Trust No. 5747 executed an agreement which provided that as of January 1, 1983, the remaining balance on the Land Bank mortgage was $443,865.73. The agreement further stated that the parties executed the agreement in order to establish the parties' equity in the real estate and to permit the Busselbergs to prepay their portion of the remaining liability on the mortgage. The agreement stated as a consideration of the property remaining as security for the loan the Busselbergs would retain a security interest in the property (in addition to their ownership interest). The Busselbergs apparently failed to record this security interest. The agreement also granted the Busselbergs the right, in the event of a default by the Drewrys and following an appraisal of the property encumbered by the mortgage, to pay off that portion of the mortgage owed by the defaulting party and have its equitable interest in the property increased by an amount equal to that paid and with the defaulting party's interest to decrease by the same amount. In the event the Busselbergs assumed the Drewrys' liability under the Land Bank mortgage due to the Drewrys' default thereunder, the Drewrys would assign 100% of their beneficial interest in Trust 5747 and the power of direction thereunder to Busselbergs.[8]

---

**8.** Apparently by the time the parties entered into the December 28, 1982, agreement the Drewrys had placed their undivided one-half interest in the 966 acres in Trust No. 5747. The parties' agreement states that Indiana Bank, as trustee under Trust No. 5747 is the owner of an undivided fifty percent of the land which it holds for the benefit of the Drewrys. The parties presented no evidence as to when the Drewrys' interest in the 966 acres of real estate became a part of the trust.

On July 8, 1983, the Drewrys, as joint tenants with right of survivorship, executed a trust agreement entitled Trust No. 1788 transferring their beneficial interest in the 966 acres, as well as other real estate to Whiting Bank as trustee. The beneficial interest transferred included the right to deal with the title of the real estate, to manage and control the real estate, and the right to proceeds from rentals, mortgages or sales of the real estate. The agreement provided that the interest transferred was deemed to be personal property which could be assigned and transferred as such and that no beneficiary would have any right, title or interest in the real estate itself but only an interest in the earnings, avails and proceeds. The agreement stated that it should not be recorded and that while Whiting Bank would be the sole owner of record of the real estate Whiting Bank would convey title to the real estate, execute and deliver deeds for or otherwise deal with the property only when authorized to do so in writing by the Drewrys. Under the trust agreement the trustee had the duty to (1) hold the title to the trust property until directed to convey it or until divested of title; (2) follow the directives of the beneficiaries; (3) forward or give notice of all legal documentation and other information concerning or affecting the property; and (4) execute and transmit all deeds, mortgages, notes, options, easements, leases and other instruments relating to or affecting the property upon receiving the directive of the beneficiary or other authorized person.

On June 17, 1983, Charles Drewry executed a Letter of Direction to Whiting Bank authorizing and directing Whiting Bank as trustee of Trust No. 1788, to "[c]ontact the [Indiana Bank] for photocopies of all documents related to the land trust designated as Trust 5747" and authorizing Indiana Bank "to provide the [Whiting Bank] Trust Department with any and all information or photocopies requested concerning Trust 5747." Letter of Direction (June 17, 1983). The record does not evidence what information, if any, Indiana Bank held in its files and sent to Whiting Bank upon receiving the Letter of Direction.

On July 8, 1983, the Drewrys executed an Assignment of Beneficial Interst in Trust as Collateral Security assigning their entire beneficial interest in Trust No. 1788 to Whiting Bank as security for a debt of approximately $3,300,000.00. On August 17, 1983, Whiting Bank filed a UCC Financing Statement evidencing the Drewrys' assignment of 100% of their beneficial interest in Trust No. 1788 as security with the Secretary of State and on August 30, 1983, filed a similar financing statement with the Recorder of Lake County. On October 4, 1983, Indiana Bank as trustee under Trust No. 5747 executed a Trustee's Deed in favor of Whiting Bank as trustee under Trust No. 1788 releasing and quitclaiming to Whiting Bank all property held in Trust No. 5747.

On September 1, 1984, the Drewrys, as lessors, entered into a Farm Lease of their interest in the 966 acres with Busselberg Farms, Inc., the Busselbergs' corporation, as lessee. The Farm Lease provided that the term of the lease was for three years with an absolute right of renewal for five successive three-year periods and that the lease only could be terminated upon an act of default of the other party. The cash rent per tillable acre under the Farm Lease was $105.00 each year. The parties further agreed that the lessee would own crops produced on the land during the term of the Farm Lease subject only to a lien for any unpaid rental at the time of harvest. On the same date Maurice L. Busselberg leased the remaining undivided one-half interest in the 966 acres to Busselberg Farms, Inc., for the annual cash rent of $65.00 per tillable acre.[9]

In October of 1984, Charles Drewry apparently told Maurice Busselberg that he could not pay the taxes or payments due the Land Bank with respect to the real estate. The Busselbergs accordingly paid

---

**9.** At the time, Maurice L. Busselberg held the undivided one-half interest as a joint tenant with his son, Paul Busselberg.

the November 1984 installment of taxes due on the land. On October 22, 1984, Grower Service obtained a judgment in the U.S. District Court in Lafayette, Indiana, against the Drewrys which was recorded in Lake County Judgment Docket 70, page 25, on October 23, 1984. Grower Service's judgment was for the sum of $219,006.41 together with costs of $66.88 plus post-judgment interest and remains wholly unsatisfied. On October 22, 1984, Conagra obtained a judgment in the U.S. District Court in Lafayette, Indiana, against the Drewrys which was recorded in Lake County Judgment Docket 70, page 25, on October 23, 1984. Conagra's judgment was for the sum of $147,539.46, together with costs of $65.16 plus post-judgment interest and remains wholly unsatisfied. Later, on November 2, 1984, Usamex obtained a judgment in the Jasper Circuit Court against the Drewrys which was recorded in the Lake County Judgment Docket 70, page 87, on November 28, 1984. Usamex's judgment against the Drewrys was for the sum of $294,743.92 plus costs and post-judgment interest. Usamex's judgment remains unsatisfied, except that Usamex received the sum of $500.00 on November 3, 1987, which was applied toward said judgment.

On January 2, 1985, Maurice L. Busselberg paid the $188,053.03 remaining liability on the Land Bank mortgage as the Drewrys no longer could make their payments.[10] Thereafter, on January 15, 1985, the Land Bank released the mortgage. On March 1, 1985, Willis Werner and Harry Bamesberger, realtors/appraisers, appraised the 966 acres at the request of Maurice Busselberg. The appraisers concluded that the value of the real estate including improvements thereon was $1,200 per acre or $1,159,200.00. Taking into consideration, however, the size of the property, the contingencies, the power line and the parties' undivided interest in the property, the appraisers discounted the value of the real estate by one-third to $800.00 per acre or $772,800.00. In accordance with the parties' agreement of December 28, 1982, the Drewrys assigned 100% of their beneficial interest in Trust No. 5747 to the Busselbergs on October 28, 1985. Prior to the assignment, however, the Drewrys filed their Chapter 11 petition on March 6, 1985.

On October 27, 1986, the court issued its Order for Summary Judgment, holding that Indiana Bank has a first lien on the property held in Trust No. 5747 by virtue of its mortgage on the real estate. The court determined that Indiana Bank holds a first lien on the beneficial interest of Indiana Bank in Trust No. 5747 by virtue of the first assignment of beneficial interest by the Drewrys, and that Whiting Bank holds a second lien on the beneficial interest of Trust No. 5747 by virtue of the second assignment of beneficial interest by the Drewrys. The court further determined that Conagra, Grower Service and Usamex hold third, fourth and fifth liens on the beneficial interest of Trust No. 5747 respectively. The court concluded that the value of the property held in Trust No. 5747 was $170,000.00, and that Indiana Bank's claims were fully secured up to that amount. The court held that Whiting Bank's interest in Trust No. 5747 was unsecured and that the judgment liens of Conagra, Grower Service and Usamex were void under § 506(d). The court further determined that the real estate subject to the first mortgage of Indiana Bank and the corpus of Trust No. 5747 were of no value to the estate.

### Arguments of the Parties

#### 1. Drewrys

In their Complaint the Drewrys contend that the transfer of their beneficial interest in Trust No. 5747 to the Busselbergs was not for equivalent value and accordingly is void under §§ 547 and 548 of the Bankruptcy Code. The Drewrys ask the court to set aside the transfer and to grant the Busselbergs a first mortgage lien against the Drewrys' interest in the real estate which the Drewrys will pay to the Busselbergs

---

**10.** On January 18, 1985, the Land Bank issued Mr. Busselberg a refund check in the amount of $14.27, representing an overpayment by Mr. Busselberg.

over thirty years at nine percent interest. The Drewrys allege that in 1985 the Busselbergs unjustifiably dropped rental payments on the Drewrys' undivided one-half interest in the real estate from $105.00 per tillable acre as set pursuant to the Farm Lease between the Drewrys and Busselberg Farms, Inc., to $65.00 per tillable acre.[11] The Drewrys assert that the Busselbergs thereby shorted them of approximately $44,655.00 per year from 1985 through 1987 for a total of $133,965.00, less $20,000.00 which the Busselbergs prepaid the Drewrys under the Farm Lease.[12] The Drewrys accordingly claim the Busselbergs owe them $115,000.00 for past rent plus interest at the rate of twelve percent on the rent payments due. The Drewrys ask the court to offset the amount due Busselbergs by $115,000.00 which amount represents rent the Busselbergs allegedly withheld from Drewrys under the Farm Lease with Busselberg Farms, Inc., along with one-half of the expenses claimed by Busselbergs for operating and upkeep of the property.

The Drewrys further assert that the assignment of their beneficial interest in Trust No. 1788 to Whiting Bank is equal in value to the fair market value of the real estate under 11 U.S.C. § 506. In their complaint the Drewrys claim the 966 acres has a value of approximately $800.00 per acre or $772,800.00, excluding the value of the grain elevator and storage facility.[13] Inasmuch as the parties cannot agree upon the value of the property, the Drewrys ask the court to ascertain the value of the real estate and to determine whether the Drewrys' offer of paying ten percent of Whiting Bank's allowed secured claim for adequate protection is sufficient under 11 U.S.C. § 361. The Drewrys contend that they still are the beneficiaries of Trust No. 1788 and that the court should not permit the abandonment of the property because it is necessary for the Drewrys' reorganization.

The Drewrys contend that they, rather than the Busselbergs, own 100% of the beneficial interst in Trust No. 5747 containing the real estate upon which the Drewrys' home is located along with other property. In addition, the Drewrys assert that as the value of the 966 acres is less than the debts to secured parties, the court should release the liens of judgment creditors Grower, Usamex and Conagra pursuant to 11 U.S.C. § 506 or § 547.

### 2. Busselbergs

The Busselbergs contend that the Drewrys committed fraud by convincing Busselbergs to pay the Drewrys' share of the debt to the Land Bank when the Drewrys already had transferred their beneficial interest in the property to Whiting Bank. The Busselbergs submit that the Drewrys never told them that Charles Drewry had established a new trust in the Whiting Bank or that he had assigned the Drewrys' interest to the Whiting Bank. The Busselbergs state that they had no knowledge that the Drewrys had encumbered any part of the 966 acres with the Whiting Bank or any other lender. The Busselbergs contend that as a result of the Busselbergs' payment of the Land Bank obligation and Drewrys' assignment of their beneficial interest in the property Drewrys have no interest in the real estate, and the Busselbergs are the true owners of the 966 acres.

In the alternative, Busselbergs assert that anyone found to have any interest in the 966 acres is responsible for their respective share of expenses, indebtedness and taxes paid by Busselbergs since 1984. In connection with this argument Busselbergs claim that they paid $34,952.99 for taxes, insurance and repairs on the 966 acres prior to paying off the Land Bank mortgage and $81,148.13 for taxes, insurance and repairs on the real estate after paying the mortgage. The Busselbergs believe they own all permanent structures

---

**11.** The parties agree that of the 966 acres of real estate 916 acres are tillable farmland.

**12.** The $44,655.00 figure used by the Drewrys is equal to $48.75 per acre (or three-fourths of $65.00 per acre) times 916 tillable acres.

**13.** The court notes that this valuation is equal to the appraisal estimation the Busselbergs obtained in March of 1985.

constructed on the farm since 1984. The Busselbergs request the court to determine that they have equitable liens against the 966 acres in the amount of $188,053.03 due to their payment of the Land Bank mortgage and in the amount of $58,050.56 for one-half of the funds they paid for taxes, insurance and repairs on the property. The Busselbergs argue that the court should hold that their equitable interests in the property are superior to the interests of Whiting Bank.

### 3. *Whiting Bank*

On March 24, 1986, Whiting Bank filed its Counter–Cross Claim against the Drewrys, Busselbergs and Indiana Bank requesting that the court determine that its interests in the 966 acres pursuant to the Drewry's execution of the Assignment of Beneficial Interest in favor of Whiting Bank are superior to all other interests in the property. Whiting Bank states that the Drewrys executed the Assignment of Beneficial Interest in the 966 acres to secure payment of their indebtedness to Whiting Bank which totalled $2,925,316.99, plus accrued interest, on the date of the filing of the debtors' petition herein. Whiting Bank asserts that inasmuch as the fair market value of the beneficial interest of Trust No. 1788 is substantially less than the debt the Drewrys owe to Whiting Bank, the beneficial interest is burdensome to the estate and of inconsequential value thereto and accordingly should be abandoned to Whiting Bank. Whiting Bank insists that all other interests in the property are inferior to its interest.

### 4. *Conagra and Grower Service*

Conagra and Grower Service argue that since Whiting Bank does not hold a mortgage with respect to the real estate held in Trust No. 1788 or with respect to the beneficial interest in Trust No. 1788 its interest is inferior to that of Conagra and Grower Service. Conagra and Grower Service sub-mit that Whiting Bank incorrectly filed a UCC–1 financing statement in order to secure its interest in the real estate when it in fact should have filed a mortgage in the property records. Conagra and Grower Service submit that Article 9 filing procedures are not applicable to chattels real or the interest in real estate held in an Indiana Land Trust. The judgment creditors accordingly assert that Whiting Bank's interest is inferior to that of Conagra and Grower Service. In the alternative, if the court determines that Whiting Bank followed proper filing procedures to secure its interest in Trust No. 1788, Conagra and Growers Service claim that their interests along with that of Usamex are superior to Whiting Bank's interest because Whiting Bank failed to include a description of the real estate constituting collateral in its UCC–1 financing statement and security agreement thereby rendering the security agreement nonenforceable.

### *Discussion and Decision*

The parties to this proceeding ask the court to determine the nature and priority of liens in certain real estate owned by the Drewrys and held in Trust Nos. 5747 and 1788.[14] The parties further ask the court to determine whether the Drewrys hold any remaining interest in the property which would be of value to the Drewrys' estate.

Indiana law provides that "[a] trust is a fiduciary relationship between a person who, as trustee, holds title to property and another person [or persons] for whom, as beneficiary, the title is held." Ind.Code Ann. § 30–4–1–1 (Burns Supp.1988). The beneficiary holds an equitable interest in the trust property which is personal property unless the terms of the trust require the trustee to distribute real property to the beneficiary at some point, in which case the beneficiary's interest is real property. Ind. Code Ann. § 30–4–2–7(a) and (c) (Burns

---

**14.** In the October 27, 1986, Order for Summary Judgment the court previously determined the nature and priority of interests in Trust No. 5747 with respect to Indiana Bank, Whiting Bank, Conagra, Grower Service and Usamex.

The court at that time, however, did not consider the effect, if any, of the Drewrys' transfer of the beneficial interest in Trust No. 5747 to the Busselbergs.

1972). Land trusts, which Indiana law recognizes as valid, are those trusts consisting solely of real property in which the beneficiary retains the power to manage, as well as the power to direct the trustee to sell, the trust property. Ind.Code Ann. § 30–4–2–13 (Burns Supp.1988) and Ind. Code Ann. § 30–4–2–13 (Burns 1972) Study Commission comment.

■ As Judge Kanne explained in *Citicorp v. Bank of Lansing*, 604 F.Supp. 585, 587 (1985), the law concerning land trusts in Indiana is somewhat different from the law in Illinois where land trusts appear to have originated. In Illinois the beneficiary of a land trust holds neither legal nor equitable interest in the trust property. *Id.* (citing *Sterling Savings & Loan Association v. Schultz*, 71 Ill.App.2d 94, 218 N.E. 2d 53, 60 (1966)). Moreover, the beneficiary's interest in an Illinois land trust is deemed to be personal property to which judgments cannot attach. *Id.* (citing *Schultz*, 218 N.E.2d at 60). On the other hand, in Indiana the beneficiary's equitable interest in a land trust is subject to judgment liens even though the beneficiary's interest is classified as personal property. *Id.* at 588–589. When trust property is sold or disposed of, liens against the beneficiary's interest attach to the beneficiary's interest in the proceeds, if any, rather than continuing to encumber the property itself. Ind.Code Ann. § 30–4–4–3 (Burns 1972). The purpose of Indiana Code § 30–4–4–3 "is to assure that trust property will be freely transferable irrespective of any any beneficiary's status as a debtor." Ind.Code Ann. § 30–4–4–3 (Burns 1972) Study Commission comment. Inasmuch as the beneficiary's interest in a land trust is personal property, the proper method of perfecting a secured interest in the beneficiary's interest is by meeting the requirements of Indiana Code § 26–1–9–101 et seq., which comprises Article 9 of the Uniform Commercial Code as adopted in Indiana.

Under Indiana Code § 30–4–2–14 a beneficiary may assign his interest in trust property to another person. Ind.Code Ann. § 30–4–2–14 (Burns 1972). If the title to the trust property and the entire beneficial interest become united in one person, however, the trust terminates with the transferee becoming the owner of the trust property. Ind.Code Ann. § 30–4–2–8 (Burns 1972). This concept is known as the doctrine of merger. The intention of the parties is controlling in determining whether an assignment is absolute or meant to be solely as collateral security or a financing arrangement. *See Union Securities v. Merchants' Trust & Savings Co.*, 205 Ind. 127, 185 N.E. 150, 153 (1933), *reh'g denied*, 205 Ind. 127, 186 N.E. 261, 261–2 (1933) and 6A C.J.S. *Assignments* § 82 (1975).[15]

■ The evidence in this case shows that on July 8, 1983, the Drewrys established Trust No. 1788 as a land trust. On October 4, 1983, Indiana Bank as trustee executed a Trustee's Deed releasing and quitclaiming all of the property held in Trust No. 5747 (including the 966 acres) to Whiting Bank as trustee under Trust No. 1788. Prior to that time, on July 8, 1983, the Drewrys had assigned their beneficial interest in Trust No. 1788 to Whiting Bank as security for a debt in the amount of $3,300,000.00, and Whiting Bank had perfected its interest in the Drewrys' beneficial interest by filing financing statements with respect thereto. Reviewing these transactions, the court concludes that a valid assignment of the Drewrys' beneficial interest to Whiting Bank occurred.

The court further concludes that Trust No. 1788 did not terminate when the assignment occurred as the parties intended for the assignment to operate merely as a secured financing mechanism rather than an unconditional and complete transfer of the Drewrys' beneficial interest to Whiting Bank.[16] Moreover, Whiting Bank perfect-

---

**15.** 6A C.J.S. *Assignments* § 82 (1975) provides that "[a]n assignment made as collateral security for a debt gives the assignee only a qualified or limited interest commensurate with the debt or liability secured, although the assignment may be absolute on its face."

**16.** The court notes that even if it were to conclude that a technical merger of interests occurred terminating Trust No. 1788 and vesting ownership of the trust property in Whiting Bank, Whiting Bank would have had the equitable obligation to transfer the property back

ed its secured interest in the Drewrys' beneficial interest in Trust No. 1788 by filing UCC–1 forms containing a proper description of the interest assigned. The description on the UCC–1 financing statement reflected a lien on "[t]he Entire (100%) Beneficial Interest in and to The First Bank of Whiting Land Trust No. 1788, dated July 8, 1983, together with collateral assignment thereof dated July 8, 1982," which with the Trustee's Deed from Indiana Bank describing the real estate transferred into Trust No. 1788 should have put anyone who was interested in encumbrances on the 966 acres on notice of Whiting Bank's secured interest.

■ As the assignee of the Drewrys' beneficial interest with a perfected security interest therein, Whiting has a first secured interest in the property held in Trust No. 1788 up to the fair market value of the property and an unsecured claim against the Drewrys' estate for any amount of indebtedness over and above the value of the property. Grower Service, Conagra, and Usamex hold judgment liens against the Drewrys' beneficial interest in Trust No. 1788. Inasmuch as Whiting Bank received the assignment of the Drewrys' beneficial interest and perfected its secured interest therein prior to the attachment of Grower Service, Conagra, and Usamex's liens to Drewrys' beneficial interest, Whiting Bank's interest is superior to the interests of the judgment lienholders.[17] As a result, Whiting Bank holds a secured interest in the property held in Trust No. 1788, and the Drewrys hold no remaining beneficial interest therein. Since the Drewrys' indebtedness to Whiting Bank apparently is greater than the value of the property held in Trust No. 1788, Grower Service, Conagra and Usamex's judgment liens are unsecured claims against the debtors' estate.

On December 28, 1982, the Drewrys granted the Busselbergs a security interest in their undivided one-half interest in the 966 acres which was then held in Trust No. 5747 in return for the Busselbergs' permitting the entire 966 acres to remain as security for the Land Bank loan although the Busselbergs already had repaid their portion of the loan. The Busselbergs apparently never recorded their security interest. The December 28, 1982, agreement provided that if the Busselbergs paid the Drewrys' remaining indebtedness to the Land Bank upon the Drewrys' default, the Drewrys would assign their beneficial interest in Trust No. 5747 (which at that time included their interest in the 966 acres) to Busselbergs.

■ On January 2, 1985, Maurice L. Busselberg paid the $188,053.03 remaining liability on the Land Bank mortgage pursuant to the parties' agreement. Prior to paying the remaining obligation, the Busselbergs apparently failed to check the property and UCC records to determine whether any other parties held secured interests in the trust property or the Drewrys' beneficial interest therein. By failing to record the security interest in the 966 acres which the Drewrys granted Busselbergs on December 28, 1982, and by failing to check the property and UCC records to determine whether any other party held a prior interest in the trust property or the Drewrys' interest therein, the Busselbergs effectively forfeited their first secured position in the Drewrys' undivided one-half interest in the 966 acres as to intervening creditors without notice of the interest. Indeed, had the Busselbergs properly recorded their secured interest in the 966 acres when they received the interest, they would have had priority over the interests of both Whiting Bank and the judgment creditors in the 966 acres. Moreover, had they conducted a title search prior to paying the balance of the Land Bank loan, they would have discovered that the 966 acres no longer was held by Indiana Bank as trustee under

---

to the Drewrys had the Drewrys repaid their obligations to Whiting Bank.

**17.** *See Middle West Roads Co. v. Peoples Nat. Bank & Trust Co. of Washington*, 210 Ind. 437, 4 N.E.2d 187, 191 (1936), as cited by 6A C.J.S. *Assignments* § 81 (1975) which states: "As a general rule, an assignee under a valid assignment generally takes priority over subsequent creditors of the assignor who had no lien on the subject matter of the assignment at the time it was made...."

Trust No. 5747 but was held by Whiting Bank as trustee under Trust No. 1788,[18] and therefore should have been alerted to conduct a search of the records to determine whether the Drewrys had entered into Trust No. 1788 in order to secure a financing transaction. As it is, the Busselbergs failed to take these precautions and accordingly became mere "volunteers" in paying the Land Bank mortgage on behalf of the Drewrys. The Busselbergs' claim in the amount of $188,053.03 against the Drewrys accordingly is an unsecured claim which falls behind the first secured claim of Whiting Bank.[19] The court denies the Drewrys' request that the Busselbergs be granted a first mortgage against the 966 acres and further finds that the Drewrys have failed to carry their burden with respect to the Busselbergs' alleged deficiencies in payments of rent on the 966 acres.

The court determines under § 544(b) that any remaining interest the Drewrys may have in the real estate by virtue of their beneficial interest in Trust No. 1788 is of inconsequential value and benefit to the estate and should be abandoned, since the Drewrys have no equity in the property and since the value of the real estate contained in Trust No. 1788 (including the 966 acres) apparently is substantially less than the amount of the Drewrys' indebtedness to Whiting Bank. The court concludes, however, that Whiting Bank's interest in the 966 acres shall be subject to an equitable lien in the amount of $58,050.56 for one-half the taxes, insurance, and repairs the Busselbergs have paid preserving the value of the 966 acres.

Inasmuch as the evidence before the court shows that the assignment of Trust No. 5747 to the Busselbergs which occurred several months after the filing of the Drewrys' petition did not operate to transfer the interest in property contemplated by the parties in their December 28,

1982, agreement and inasmuch as the court previously determined that Indiana Bank has a first mortgage on the property held in Trust No. 5747 by virtue of its mortgage on the real estate, the court holds that the Busselbergs have no interest therein by virtue of the October 28, 1985, assignment from the Drewrys.

### Conclusion

WHEREFORE, the court finds that Whiting Bank holds a first secured interest up to the value of the property held in Trust No. 1788 and holds an unsecured claim against the debtors' estate for any remaining indebtedness over and above the value of the property. The court further determines that the property held in Trust No. 1788 shall be abandoned but that Whiting Bank's first secured position in Drewrys' undivided one-half interest in the 966 acres is subject to an equitable lien in the amount of $58,050.56 in favor of the Busselbergs for one-half of the taxes, insurance, and repairs the Busselbergs paid to preserve the value of the real estate. The court concludes that Grower Service, Conagra, Usamex and Busselbergs hold unsecured claims against the Drewrys' estate. Moreover, the court further concludes that the Busselbergs have no interest in the property held in Trust No. 5747. It is

SO ORDERED.

---

**18.** A title search also may have revealed the judgment liens against the Drewrys.

**19.** While the record is unclear, the court notes that the Busselbergs might have had grounds to

file a complaint against the Drewrys under 11 U.S.C. § 523 to have the Drewrys' obligation to them excepted from their discharge.